## Lavinski v. Delaware, Lackawanna & Western R. R. Co.

*Workmen's compensation—Course of employment—Disobedience of orders —Acts foreign to employment—Plea of custom— Test of right to compensation—Procedure after appeal—Act of June 26, 1919.*

1. Where a mine employee, a doortender in charge of six doors, leaves his proper working place, and, in disobedience of his employer's orders, takes a "joy ride" on a mine motor to a point on the employer's premises 610 feet or more away from his proper working place, at which point no duty or anything in the nature of his employment required his presence, and he is there injured, compensation for the injury may not be allowed.

2. Under the Workmen's Compensation Act the employer is not an insurer of his employees during working hours, wherever they may be on the employer's premises and regardless of what they are doing.

3. Where the employee, when injured, was not obviously and immediately furthering his employer's business, the test of the right to compensation is: "Was what the employee was doing when injured during working or rest hours, and while on the employer's premises or on his way to and from said premises, something reasonably essential to his health, comfort and efficiency as a workman? If so, he is entitled to compensation." Or, "Was the employee injured while doing something which the employer at the time he and the employee entered into the contract of hiring might reasonably expect the employee to do in the course of his employment, and was he at a place the employer might reasonably expect him to be? If so, he is entitled to compensation."

4. When the Common Pleas sustains an exception to an award and reverses the action of the board and remits the record to the board for further hearing and determination, the act gives a claimant opportunity to present additional evidence to sustain his claim, but if such evidence be merely cumulative, the board must disallow the claim.

Act of June 26, 1919, P. L. 642, considered.

Appeal from decision of the Workmen's Compensation Board. C. P. Lackawanna Co., June T., 1921, No. 251.

*R. J. Dever*, for claimant; *D. R. Reese* and *E. D. Adair*, for defendant.

MAXEY, J., Nov. 10, 1922.—This is the second time this case has been before us. On April 26, 1921, Commissioner Houck, of the Workmen's Compensation Board, filed the following opinion:

"The referee found in this case that the claimant was employed by the defendant as a doortender, and that while riding on a motor in the defendant's mine for the purpose of tending to one of the doors of which he had charge, his foot caught between a rail and the motor and smashed two of his toes, resulting in total disability up to June 11, 1920. The referee accordingly awarded compensation, and the defendant has appealed. The defendant's main contention is that there is no evidence to warrant the findings of the referee.

"The evidence shows very clearly that the claimant was employed as a doortender in the defendant's mine and that he had charge of about six doors. It was his duty to open these doors to allow the motor and the cars attached to it to pass through, and then to close the door in order that the air currents in the mine would not be interrupted. These six doors were situated at a considerable distance from each other. One of the defendant's section foremen testified that the distance between the two farthest doors is 1430 feet. The evidence also shows that the claimant, after opening and closing one door, customarily rode on the motor to the next door which was to be opened. It was while riding the motor in this fashion and for this purpose that he met with the accident. The evidence also shows, and it is admitted by the claimant, that he was directed, on several occasions, by his superiors not to ride on the motor. He was to learn from the motorman what door was to be opened

next and to proceed to that door on foot. From all the evidence in the case, it is very apparent that the claimant was in the course of his employment when he was injured. He was proceeding with the motor to the next door which it was his duty to open.

"The case then involves the single proposition, whether the claimant's right to compensation is defeated by reason of the fact that he was disobeying orders at the time he was injured. The board is of the opinion that this does not bar the claimant. His disobedience of the order not to ride on the motor was nothing more than negligence on his part, and negligence on the part of the employee is no bar to compensation: Gurski v. Susquehanna Coal Co., 262 Pa. 1. Conceding, therefore, that the claimant was performing his duties in a negligent manner and contrary to express instructions, he, nevertheless, was injured while in the course of his employment and is entitled to compensation. The findings of the referee are supported by the evidence and his conclusions based thereon are without error.

"The findings of fact and conclusions of law of the referee are affirmed and the appeal is dismissed."

The defendant took an appeal, and we held, in an opinion filed Jan. 9, 1922, that the award of the Workmen's Compensation Board in this case was not supported by competent and sufficient evidence, and we reversed said award and remitted the record to the board for further hearing and determination as prescribed by law. We held that the evidence conclusively established, not, as the learned commissioner found, that "he (the claimant, when injured) was proceeding with the motor to the next door which it was his duty to open," but that he was proceeding *from* the very door he was employed to open and was, according to his own statement, 800 feet from his post of duty when he was injured, and that at the time he was doing something which was not only foreign to his employment, but which he was expressly and repeatedly forbidden to do, to wit, riding on the mine motor.

We based our conclusion upon the testimony of the claimant himself, as well as upon the other testimony in the case. The claimant testified, in substance, that at the time he was injured he was on the motor merely "for the ride," and that the door at which he was injured was not a door that he was tending, that it was 800 feet from the nearest door it was his duty to tend, and that the place at which he was injured was not on the way to any of the other doors. We quote from page 12 of the testimony:

"Q. Now, which one of those doors were you injured at? A. Down further from my doors—another door. Q. It was not at the door you were tending? A. No. Q. Down further, you say, from your door? A. Yes. Q. From what door? A. From 'U' gangway down further. Q. How much further? A. About 800 feet, I guess. Q. Was it in the direction of any of the other five doors you were tending; in other words, did you have to go that way to get to any of the other doors? A. No, sir. Q. What were you doing down there? A. I told you once I was on the motor. Q. What business did you have on the motor? A. I was down for the ride; I used to be on the motor wherever they went. Q. You had been told not to do it? A. Yes."

After the filing of our opinion, the Workmen's Compensation Board granted a hearing de novo. No additional testimony was offered, but the testimony on the record was adopted as though taken before the board. The Compensation Board then, on Aug. 4, 1922, handed down an opinion by Commissioner Houck. The commissioner in his opinion, *inter alia,* says:

"We cannot escape the conclusion that the claimant was in the course of his employment when injured. Section 301 of the Workmen's Compensation

3 D. & C.

Act provides that injury by accident in the course of employment shall include all injuries sustained while the employee is actually engaged in the furtherance of the business or affairs of his employer, and shall include all injuries caused by the operation of the employer's business on the premises sustained by an employee who, though not so engaged, is injured upon the premises occupied by and under the control of the employer, the employee's presence thereon being required by the nature of his employment. In our opinion, the claimant falls within both branches of this definition. He was furthering the business or affairs of his employer when he was riding on the motor from door to door. Granting that he could have waited at the door until the motor returned, and granting that he was disobeying orders by riding on the motor, that does not take him out of the course of his employment. At the most, his disobedience of orders was negligence and is no bar to compensation: Gurski v. Susquehanna Coal Co., 262 Pa. 1. And the claimant was certainly injured on the employer's premises by the operation of the employer's business or affairs, and his presence on the premises was required by the nature of his employment."

When we reversed the Workmen's Compensation Board in our opinion handed down Jan. 9, 1922, we believed that we followed the decision of the Supreme Court in Kuca v. Lehigh Valley Coal Co., 268 Pa. 163, which case was referred to in our opinion. In that case, as the Supreme Court pointed out, "Kuca left his regular working place on Road 203, and went to another section of the mine, namely, Road 242, along which he traveled for some distance until he came to an old abandoned opening, which had been driven to a depth of 120 feet off the last-mentioned road. He and a companion went into this old abandoned opening a distance of about 70 feet and there caused an explosion of gas. No duty or business called him to the scene of the accident, which was 500 feet distant from his proper working place. When he met death, he was not engaged in the furtherance of the business or affairs of his employer, and nothing in the nature of his employment required his presence within 500 feet of the scene of the accident or in the section of the mine where the accident occurred."

In the case at bar the claimant was, as the foreman testified, 610 feet away from his proper working place, or, as the claimant himself testified, 800 feet from his proper working place. No duty or business called him to the place where he met his accident. When he met his injury, he was not engaged in the furtherance of the business or affairs of the employer, and nothing in the nature of his employment required his presence within 610 or 800 feet of the scene of the accident or in the section of the mine where the accident occurred.

All persons are entitled to compensation for injury by accident in the course of employment, and in two classes of cases it is held that an employee is injured in the course of employment:

1. When he is injured while actually engaged in the furtherance of the business or affairs of his employer, whether upon the employer's premises or elsewhere.

2. When, "though not so engaged," his injury is caused by (a) the condition of the premises, or (b) the operation of the employer's business or affairs thereon, provided he "is injured upon the premises occupied by or under the control of the employer, or upon which the employer's business or affairs are being carried on," and provided "the employee's presence thereon" is "required by the nature of his employment:" Section 301 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, 738.

The phrase "the employee's presence thereon" has been interpreted by the

highest court of the state as meaning the employee's presence, not *anywhere* on property owned or controlled by his employer, but his presence "at his proper working place," or where "duty or business called him:" Kuca *v.* Lehigh Valley Coal Co., 268 Pa. 163.

It has also been held that an accident occurs within the course of employment, within the meaning of said section 301, if it happens during the lunch or rest period spent on the employer's premises, unless it appears that the claimant at the time of the injury was doing something wholly foreign to his employment: Granville *v.* Scranton Coal Co., 76 Pa. Superior Ct. 335.

It has also been held that if an accident occurs to an employee during a short interval of waiting for the arrival of some material to load, it is an accident in the course of employment, and that an employee's period of employment is not broken by such an interval of waiting, that while waiting for material to load he is "discharging precisely the duty laid upon him by his employer and in the manner expected of him. . . . 'It cannot be said that the employment is broken by mere intervals of leisure, such as those taken for a meal. . . . Acts of ministration by a servant to himself, such as quenching his thirst, relieving his hunger, protecting himself from excessive cold, performance of which while at work are reasonably necessary to his health and comfort, are incidents to his employment. . . . Consequently, no break in the employment is caused by the mere fact that the workman is ministering to his personal comforts or necessities, as by warming himself, or seeking shelter, or by leaving his work to relieve nature, or to procure drink, refreshments, food or fresh air, or to rest in the shade:' 1 Honnold on Workmen's Compensation, § 111. Nor do we regard the fact that the accident resulted from his (the employee's) striking a match for the purpose of enabling him to smoke at that time and place as being sufficient to debar him and his dependents from the benefits of the statute. It is not unreasonable for workmen to smoke out of doors during intervals of work, where it does not interfere with their duties. And in this instance the foreman testified that he did not interfere with the men when they were smoking outside of the building, but he did not allow smoking inside:" Dzikowska *v.* Superior Steel Co., 259 Pa. 578.

It has also been held that an employee "going after his dinner-pail at the noon hour, preparatory to eating his dinner, is as much in the course of his employment as a man going to his home at the completion of an errand. . . . The fact that he chose for his own convenience to ride, instead of walk, in going after his dinner would not deprive him of compensation if he was injured on the way:" Blouss *v.* D., L. & W. R. R. Co., 73 Pa. Superior Ct. 95, 98.

It has also been held that a person is injured in the course of his employment if he is injured while on his way to fetch tools with which to work; in other words, while he is upon the premises of the employer and actually in furtherance of the latter's business: Gurski *v.* Susquehanna Coal Co., 262 Pa. 1.

We are convinced, after a careful study of the evidence in this case, that the facts of the case bring it squarely within the rule laid down by Kuca *v.* Lehigh Valley Coal Co., 268 Pa. 163. Not only was the employee, when injured, not furthering the business or affairs of his employer, but he was actually hindering the same; and not only was he not doing anything incidental to his employment, he was doing something wholly foreign to his employment.

We find no sufficient and competent evidence to sustain the commissioner's finding that the claimant's "riding on the motor served to prevent delay" in

3 D. & C.

the performance of his duties. Certainly the claimant's riding on the motor 610 or 800 feet away from his nearest door (testimony, page 20), and not in the direction of any of his doors (pages 12 and 13), could not further the master's business. In fact, when the claimant was riding on the motor at the particular place he was injured, he was hindering his master's business, for he knew that the motor had to return through the door on what is known as the "U" road; and the obviously proper thing for him to have done was to close that door when the motor went through, and wait there to open the door when the motor returned. Claimant got on the motor after opening the gate at the "U" gangway (page 14), though he knew the motor, after delivering "empties" to the face of the chamber, was going to return through the very door he was employed to open and to close (page 14). See, also, pages 21 and 22 of the testimony. "I was away from them," that is, the doors he had to tend, testifies the claimant (page 14).

Not only is it clear from the claimant's own testimony, as well as other evidence in the case, that the claimant was taking a "joy ride" 610 feet from his nearest door when he was injured, but it is also clear that his riding on the motor, even in the vicinity of his own doors, was unnecessary and not incident to his employment. He first tended to three doors on two different roads (page 8); there was a door on "R" gangway, about 150 or 200 feet from the other door on "U" gangway (page 9); there was a door on "U" gangway and a door on "U" airway, 30 feet apart. Later, to his three doors he added two other doors, on Steve Pops's road (page 9). These two doors were about 100 feet apart. They were about 800 feet from the original three doors (page 10). Then he was given a sixth door, about 70 feet from one of his other doors. Later, it appears that the "U" airway was worked out (page 12), and, of course, the door on that airway then required no tending.

It appears from the testimony of Anthony Craig (brakeman on the mine motor) that the motor that went through the doors tended by the claimant made only two or three trips a day through those doors.

These facts, and a great many more in the testimony, rebut the argument that claimant's riding on the motor increased his effectiveness as a doortender, or, as the commissioner put it, "served to prevent delay." On the contrary, the claimant's riding on the motor did just the opposite. A doortender is supposed to be at his post, to see the mine motor coming, to let it and its trips of cars pass, and to close the door afterwards. When the claimant rode on the motor, even in the part of the mine where his doors were located, he made it necessary for the motor to stop or slack up while he "would jump off the motor and run ahead and open it (the door)" (page 32). When that motor had a trip of cars attached to it, the claimant would have to wait until the trip passed through the door, then close his door and catch up to the motor or have it wait for him. Mine motors; particularly those switching cars near the face of chambers, run no faster than a boy can run or walk rapidly; and there was nothing in the nature of this boy's employment to cause him to ride on the motor, even in his own part of the mine, and certainly nothing in the nature of this boy's employment required him to ride on this motor at the point where he was injured, which he says was 800 feet from his nearest door, and which the foreman says was 610 feet from his nearest door.

We at an earlier day worked on mine motors. We think we understand the precise nature of the claimant's work. When he assumed to tend his doors by riding on the motor as it went from one section of the mine to another, and by leaping off and running ahead to open his doors, he was doing something

which the motor brakeman could just as well perform as he, for the motor brakeman is usually disengaged, except when employed on trips in throwing switches (page 34), and if the employer wished to have the doors tended as claimant tended them, the employer would have used the motor brakeman for this purpose. It is also to be observed that the crew of the motor consisted not only of the motorman and brakeman, but a reel boy. This crew needed no assistance from the door boy, that is, the claimant, to pass through other doors than those at which the claimant was stationed, for it was the duty of the reel boy to open and close doors when no door boy was in attendance at a particular door and when the motor wished to pass through (see testimony of claimant, page 17; testimony of Anthony Craig, page 36; testimony of H. C. Burbank, pages 51 and 52). In fact, the motor brakeman tended the door where claimant was hurt. A man or boy could walk around to all the claimant's six doors in three-quarters of an hour (page 35), and the claimant had to do it only two or three or four times a day (page 35). It is clear from the testimony of H. C. Burbank (page 44), foreman of the section of the mine where the claimant was employed, that the claimant's duties were to go on foot to the doors he tended, and that there was always ample notice of what door was next to be opened, and ample time for the claimant to go there on foot (pages 49 and 50) ; that the longest distance claimant had to walk from door to door was 710 feet; that he would be given from three-quarters of an hour to an hour to walk that distance (page 50). Claimant's duty was to "ascertain from the motorman which road he was going on next, and while the motor was getting the trip (that is, collecting the cars from the face of the chambers), he would go to his gate" (that is, the gate next to be opened) (page 51). If the claimant for any reason was not at the door at the proper time, the reel boy would tend it (page 51). Only two trips a day were made on "U" gangway (page 52). The farthest distance claimant under any conditions had to walk was 1430 feet (page 54), and he would have from a half hour to an hour's time to do this (page 54). It was against the rules for any one except a motor crew to ride on a motor (page 54). The claimant had no business at all where he was injured, and it was actually 610 feet from the nearest door he had to tend (page 55). When the motor went into the place where claimant was injured, claimant knew it was coming out the same way, as there was "just one avenue to go in and come out" (page 55).

Thus, claimant's ride up to that point was simply a ride for pleasure. It was in no way in furtherance of his master's business, but was entirely foreign to his employment. Claimant, in making a complete circuit in opening and closing every one of his doors, would have to travel only about one-half mile (page 56). In one gangway, known as "U" gangway or "18" gangway, the motor made only one or two trips daily. Here the doors were 30 feet apart (page 19). In gangway or road "16" the motor made two or three trips daily. The doors in this gangway were only 150 or 200 feet from the door on "U" gangway (page 9). In gangway "17," otherwise known as Steve Pops's gangway, the motor made five or six trips a day. The two doors there were only 100 feet apart (page 10). The motorman in charge of the motor passing through claimant's doors had only twenty-two miners to deliver cars to and take cars from, in nine hours (page 66). This indicates that the motor's trips did not have to be either very fast or frequent.

The driver boss, James O'Malley, testified (page 76) that he had "as high as ten times" instructed claimant to "keep off that motor." This testimony was pertinent, not on the question of negligence, for with that question we have nothing to do, but as showing that the claimant's superiors did not regard

3 D. & C.

motor riding by the claimant as in any way necessary or helpful to him in the performance of his duties; in other words, that they did not regard claimant's riding on the motor as furthering the master's business, but they did regard it as being something wholly foreign to his employment. Claimant denied to the driver boss that he ever rode the motor (page 77).

Anthony Gannon, motor brakeman, testified (page 88) that when the claimant was riding on the motor, the motorman would stop the motor for him (that is, the claimant) to get off and open a door.

It is clear from the claimant's own testimony that at the time and place when and where the accident occurred to him, he was not even giving any assistance to the furtherance of his master's business, but, as he said himself, he "was down for the ride." This is shown not only by the testimony cited, but also by claimant's answers to further questions of his counsel (page 17):

"Q. Whose gate was it (referring to the gate near which the accident happened)? A. The brakeman, I guess, used to run ahead. Q. Why did you run ahead this day? A. I didn't. Q. You didn't run ahead? A. No. Q. You were on the motor? A. Yes. Q. You didn't tend that gate that day? A. No, sir. Q. It was some other fellow's gate? A. The brakeman. Q. Did he open it that day? A. I guess he had to tend it. . . ."

On cross-examination: "Q. You were never asked to tend it (that is, the gate near which claimant was injured), and you were never given that gate to tend to? A. No, sir."

In the light of the testimony, we fail to find any competent and sufficient evidence to sustain the board's third finding, that "the claimant's riding on the motor served to prevent delay," or to support the board's ninth finding, that "at the time of the injury the claimant was in the course of his employment and the injury was sustained on the premises of the defendant by the operation of the defendant's business, and the claimant's presence on the premises was required by the nature of his employment."

On the contrary, we hold that the evidence supports the finding that—to slightly paraphrase Kuca v. Lehigh Valley Coal Co., 268 Pa. 163—no duty or business called claimant to the scene of the accident, which was 610 feet distant from his proper working place; when he sustained his injury, he was not engaged in the furtherance of the business or affairs of his employer, and nothing in the nature of his employment required his presence within 610 feet of the scene of the accident or in the section of the mine where the accident occurred.

The commissioner emphasized the fact that the claimant "customarily rode on the motor from door to door in the performance of his duties." The evidence conclusively establishes that the claimant was riding away from his door when injured, not from door to door, and certainly if what an employee did when injured was foreign to his employment, the fact that he customarily did it does not make it incidental to his employment. An employee's custom of doing something he was not employed to do, and which he was positively forbidden to do, ought not to avail him as a defence to the charge that what he was doing when hurt was foreign to his employment. As well might a trespasser by stealth plead that by his forbidden trespasses he had acquired title to the land trespassed upon.

We are not basing our conclusion and judgment in this case on the theory that the claimant's disobedience of orders was negligence. We are fully aware that negligence is no bar to compensation. We are not concerned in the slightest degree with claimant's negligence. His disobedience of orders in riding on the mine motor is in this case, not as evidence of negligence, but as relevant

and weighty evidence of the fact that his riding on the motor was something he was not employed to do; something he was not paid to do; something which did not further his master's business, and, hence, something wholly foreign to his employment. If claimant's presence on the mine motor and at the place he was hurt was required by the nature of his employment, it is certain that his "bosses" would not have emphatically forbidden that very thing. If riding on the motor near the doors he was paid to attend was forbidden as foreign to his employment, it was certainly even more foreign to his employment at a point 610 feet away from the nearest of those doors.

In those cases where the employee, when injured, was not obviously and immediately furthering his employer's business, we think the test of whether or not he is entitled to compensation is the following: Was what the employee was doing when injured, during working or rest hours and while on the employer's premises or on his way to and from said premises, something reasonably essential to his health, comfort and efficiency as a workman? If so, he is entitled to compensation.

Or the test might be expressed this way: Was the employee injured while doing something which the employer, at the time he and the employee entered into the contract of hiring, might reasonably expect the employee to do in the course of his employment, and was he at a place the employer might reasonably expect him to be? If so, he is entitled to compensation.

These tests do not exclude negligent acts, for employees, even while furthering their employer's business or attempting to promote their own health, comfort or efficiency as workmen, often act negligently, and employers have every reason to expect from the infirmities of human nature that many negligent acts will be done by their employees. Negligent acts of employees are the inevitable burdens of every business, and, under the Workmen's Compensation Law, the employer must assume such burdens. But even under the Workmen's Compensation Law employers do not assume the burden of compensating an employee who is injured while absent without just excuse from his proper working place and while doing something foreign to his employment. Such acts are much more than mere negligence. They are fundamental breaches of the contract of hiring.

We believe the principle underlying the test suggested is the principle on which was decided the case of Blouss v. D., L. & W. R. R. Co., 73 Pa. Superior Ct. 95, where the employee was injured in going for his dinner-pail preparatory to eating his dinner; and the case of Gurski v. Susquehanna Coal Co., 262 Pa. 1, where the employee was injured going for his tools; and the case of Dzikowska v. Superior Steel Co., 259 Pa. 578, 581, where the employee was injured by striking a match incident to taking a smoke during an interval of work, the Supreme Court saying: "It is not unreasonable for workmen to smoke out of doors during intervals of work, where it does not interfere with their duties." Such smoking by one accustomed to smoking might reasonably be said to be essential to the comfort and efficiency of the employee, and to have been within the contemplation of employer and employee when the contract of hiring was entered into.

The principle underlying the test suggested is the principle in the case of Granville v. Scranton Coal Co., 76 Pa. Superior Ct. 335, cited heretofore. This case, which is largely relied upon by the commissioner, is easily distinguishable from the case at bar, for in the Granville case "the employee was killed in the breaker where he was regularly employed (quoting the Superior Court, at page 343) by the very operation of his employer's business, at a place on the premises where, though not connected with his work, he was permitted to

3 D. & C.

pass on his way out of the breaker, and during a period which was especially set aside for the refreshment and rest of the various employees, and when their presence was not confined to the particular platforms upon which they usually worked . . . (page 342). The place of employment is not confined to the place at which the workman is employed, but may include the places on the master's premises traversed by the employee in going to and from his work, and the places used by the employee with the master's consent."

In the case at bar, Lavinski was injured in a place he was not permitted to be, a place 610 feet from his nearest assigned and permitted place, not during a rest hour, but during a period he was supposed to be alert and vigilant at his post; not on something used by the employee with the master's consent, but on something he was expressly forbidden to be on, to wit, the mine motor.

Lavinski's claim did not fall within the principles of the cases first cited above. Lavinski at the time was not doing anything reasonably essential to his health, comfort or efficiency as an employee, nor was he doing anything which the employer, when he entered into the contract of hiring, might reasonably have expected him to do in the course of his employment. Therefore, in doing what he did and being where he was, Lavinski was guilty of something more than mere negligence; he was guilty of a fundamental breach of his contract of hire; he was not furthering his master's business; he was doing something foreign to his employment, and, hence, his injury then and there was not compensable.

Lavinski's claim falls within the principle of Kuca *v.* Lehigh Valley Coal Co., 268 Pa. 163, cited above. In the Kuca case the important fact is not that Kuca went into "an abandoned opening," for employees not infrequently go into abandoned openings to immediately further the master's business or to do something reasonably essential to their personal comfort. Examples of such errands into abandoned openings are these: To repair walls of air-passages, to open watercourses, to repair electric wires, which frequently take short cuts across such openings; and when abandoned openings are in close proximity to the employee's work, it is quite usual for employees to go there to relieve nature. The important fact in the Kuca case is that, from the evidence, "no duty or business called him (Kuca) to the scene of the accident, which was 500 feet distant from his proper working place." Likewise, in the Lavinski case, it positively appears from the evidence that not only "no duty or business called him (Lavinski) to the scene of the accident, which was 610 feet distant from his proper working place," but also that he would not have been there to receive an injury if he had not violated the positive command of his employer.

The line between what is incidental to one's employment and what is foreign to it must be drawn somewhere, unless the employer is held to be an insurer against the consequences of every accident that might happen to an employee during the time of his employment. We think the line is clearly and logically drawn by the Supreme Court in the Kuca case, above referred to.

Our respect for the Workmen's Compensation Board, our desire to be liberal in our interpretation and application of the Workmen's Compensation Law, and our sympathy with any employee who is injured in either furthering or not furthering his master's business, all constrain us to award the claimant the compensation asked for; but, on the other hand, we feel that to award compensation in this case would establish an unfair and dangerous precedent, and that if compensation is allowed on the facts before us, there is practically no limit to the privilege of employees to wander far away from their posts of duty and to be where they have no business to be, and if mishap should there

overtake them, to set up successfully the plea that they were about their master's business and receive compensation.

To hold that the claimant is entitled, under the facts of this case, to compensation is tantamount to holding that the Workmen's Compensation Act makes the employer an insurer of his employees during working hours, wherever they may be on the employer's premises and regardless of what they are doing. If the act was intended as an insurance act, the framers of the law would have plainly said so.

In the light of the evidence in this case, we, therefore, reverse the findings of the Workmen's Compensation Board which control the case, to wit:

The third finding, as expressed in the opinion filed April 26, 1921, that "the claimant was in the course of his employment when injured, and was proceeding with the motor to the next door which it was his duty to open."

The third finding, as expressed in the opinion filed Aug. 4, 1922, that "the claimant's riding on the motor served to prevent delay."

The ninth finding, as expressed in the opinion filed Aug. 4, 1922, that "at the time of the injury the claimant was in the course of his employment and the injury was sustained on the premises of the defendant by the operation of the defendant's business, and the claimant's presence on the premises was required by the nature of his employment."

*Findings of fact by the court.*

We find:

1. That Lavinski, the claimant, was employed as a doortender, not as a part of the motor crew, and that his duties as doortender required him to be as near as possible to his doors at all times, not only to open them after the motor passed through and close them afterwards, but also to be vigilant at all times in seeing that these ventilating doors were not left open or ajar when employees passed on foot.

2. That the claimant's riding on the mine motor did not serve to prevent delay, but served to cause delay, as we pointed out, . . . and that, therefore, Lavinski's act in riding on the mine motor was not an act in furtherance of his master's business, but in hindrance of it.

3. That, as in the Kuca case, *supra,* nothing in the nature of the claimant's employment required his presence at or near the scene of the accident.

4. That what the claimant was doing at the time he was injured was entirely foreign to his employment, and, therefore, such a fundamental breach of the contract of hiring as to disentitle him to any compensation for the injury received.

5. That a just interpretation and administration of the Workmen's Compensation Law negatives the demand that an employer compensate an employee whose explicit duty it was to tend doors and at all times to remain on foot within a definite area, but who, in disregard of his duty, jumped on the mine motor and merely for his pleasure rode away from the area of his prescribed duties to another part of the mine, and there received an injury by having his foot caught between the motor and the rail. As well might it be demanded that when a gateman employed at a railroad crossing abandons his gates, jumps on a passing coal train for a "joy ride" to the next crossing, and is at the latter crossing injured by having his foot caught between the rail and the car he is riding on, he should receive compensation from his employer.

Since we are reversing the action of the Workmen's Compensation Board and remitting the record to the board for further hearing and determination, we suggest as a matter of procedure that the "further determination of the

3 D. & C.

board" should conform to our findings and conclusion. As was said by the Supreme Court in the case of Kuca *v.* Lehigh Valley Coal Co., 268 Pa. 163: "When the Common Pleas sustains an exception to an award and reverses the action of the board, it must remit the record to the board for further hearing and determination: Article IV, § 427, of the Act of June 26, 1919, P. L. 642. In furtherance of its humane purpose, the act gives claimant every opportunity to produce evidence to sustain her claim, and, in directing that the report be returned to the Compensation Board for further hearing, opportunity is presented to produce such additional evidence. It was not intended that such hearings should continue indefinitely, and if the new evidence is merely cumulative, it is the duty of the board to disallow the claim."

## Judgment.

Now, to wit, Nov. 10, 1922, the appellant's 1st, 2nd, 3rd, 4th, 5th, 7th, 8th and 9th exceptions to the findings of fact and conclusions of law and award of the Workmen's Compensation Board are sustained, and the action of the board founded on the findings and conclusions so excepted to is reversed. The record is remitted to the Workmen's Compensation Board for further hearing and determination.

From William A. Wilcox, Scranton, Pa.